## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

STEWART SPENCER and
SHANNON SPENCER,

       Plaintiffs,                         Case No. 15-11421
                                             Hon. Gerald E. Rosen

- and -

EMPLOYERS INSURANCE OF
WAUSAU,

       Intervening Plaintiff,

v.

DTE ELECTRIC COMPANY, *et al.,*

       Defendants.
_____/

### OPINION AND ORDER REGARDING
### MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on        January 17, 2017

PRESENT:  Honorable Gerald E. Rosen
                   United States District Judge

## I. **INTRODUCTION**

Plaintiffs Stewart Spencer and Shannon Spencer commenced this action in

this Court on April 20, 2015, asserting state-law claims of negligence against

Defendant DTE Electric Company and affiliated entities (collectively "DTE")
arising from Mr. Spencer's injury in an October 1, 2012 workplace accident at
DTE's Belle River Power Plant.[1]  After DTE filed a notice indicating that FR
Brand Holdings, Inc. and other related entities (collectively "Brand") might be at
least partly responsible for causing Plaintiff's injury, Plaintiff filed a first amended
complaint on September 25, 2015 naming Brand as an additional Defendant.[2]  This
Court's subject matter jurisdiction over this matter rests upon the diverse
citizenship of the parties.  *See* 28 U.S.C. § 1332(a).

Three summary judgment motions presently are pending before the Court.
First, Defendant Brand argues that the record fails to give rise to any legal duty it
owed Plaintiff at the time of his workplace accident, where Plaintiff's injuries, in
Brand's view, arose from a condition at DTE's power plant rather than any act of
negligence by Brand.  It follows, according to Brand, that Plaintiff's claims are

---

[1]Plaintiff Shannon Spencer seeks to recover only under a loss of consortium
theory, and her claim is entirely derivative of and contingent upon the claims asserted by
her husband, Plaintiff Stewart Spencer.  Accordingly, for ease of reference, the Court will
refer to Mr. Spencer as the sole "Plaintiff" throughout the remainder of this opinion.

[2]In addition, by order dated October 6, 2015, Employers Insurance of Wausau was
granted leave to intervene in this action, on the ground that it had paid workers'
compensation benefits to Plaintiff on behalf of his employer and thus claimed a workers'
compensation lien against any recovery secured by Plaintiff in this suit.  Again, because
the claim of this intervening plaintiff is wholly contingent upon Plaintiff's recovery, the
Court need not separately address this insurer or its claim in the remainder of this opinion.

governed by premises liability law, and that such claims may be brought only against a party that has possession and control of the premises.

Next, Plaintiff has filed a motion for partial summary judgment, seeking a ruling as a matter of law that DTE retained sufficient control over the work site where Plaintiff sustained his injury to be held liable for this injury. DTE, for its part, seeks an award of summary judgment in its favor on the ground that it did not, as a matter of law, retain sufficient control over the work site to be held liable under Michigan law for the injury sustained by Plaintiff at this site. Alternatively, DTE suggests that Brand is correct in asserting that Plaintiff's claims sound in premises liability, and it argues that the condition at its plant that gave rise to Plaintiff's injury was both open and obvious and located in an area that Plaintiff lacked permission or authority to enter.

These three motions have been fully briefed by the parties. Having reviewed the parties' briefs and accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' motions "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion sets forth the Court's rulings on these

3

motions.

## II. FACTUAL BACKGROUND

**A.    The Parties**

At the time of the accident giving rise to this suit, Plaintiff Stewart Spencer was an employee of non-party Monarch Welding & Engineering, Inc. ("Monarch"). In the fall of 2012, Monarch was retained by Defendant DTE to perform scheduled maintenance on an air heater — specifically, the Unit Two West Primary Air Heater ("WPAH") — at DTE's Belle River Power Plant in East China Township, Michigan. In connection with this project, DTE contracted with Defendant Brand to place plywood decking over open areas within the WPAH so that workers could perform maintenance on the air heater without falling through these gaps.

**B.    The Maintenance Work on the WPAH**

The WPAH consists generally of upper and lower chambers separated by a circular heating surface called a "stator." (*See* DTE's Motion, Ex. A, Photograph of WPAH; Ex. B, Descriptive drawings of WPAH.) Cold air is forced into the lower chamber of the unit (the "L-WPAH") and blown by a large rotating hood through the stator, and the resulting warm air is then blown out of the upper chamber (the "U-WPAH") by another large rotating hood. The stator is

4

approximately 37 feet in diameter, and is comprised of a series of concentric steel rings intersected by steel strengthening plates.  A number of metal radiators (known as "baskets") are fitted into the grid system formed by the intersecting steel components of the stator, so as to completely fill in the stator and make one large radiator to heat the air as it passes through the stator.  (*See* DTE's Motion, Ex. C, Photo from inside the U-WPAH depicting baskets.)

Over several years of operation, the baskets in the WPAH get clogged with ash and must be replaced.  As the old baskets are removed, DTE engineers inspect the stator to look for cracks in the welded joints where its steel components intersect, and any such cracks are repaired before the new baskets are installed. During the time between the removal of the old baskets and the installation of the new ones, there are gaps in the grid work of the stator.  In the course of the maintenance work giving rise to this suit, DTE retained Brand to place plywood decking over the grid work so that workers could access the U-WPAH without falling into these voids.

**C.    Plaintiff's Injury While Performing Maintenance on the WPAH**

In the fall of 2012, DTE entered into a contract with Monarch to perform maintenance work on the WPAH.  As part of this project, Plaintiff and his co-workers at Monarch spent about three weeks removing the old baskets from the

5

stator.  Plaintiff testified that this work was completed by Friday, September 28, and that he and his co-workers spent their shift on Saturday, September 29 removing their tools and picking up scrap metal so that DTE could inspect the stator the following day and determine which parts of this steel structure were in need of repair.  (*See* Brand's Motion, Ex. A, Plaintiff Stewart Spencer's Dep. at 59-62.)

According to Plaintiff, wood decking was in place to cover the gaps in the stator's grid work as he and his co-workers completed their clean-up work on September 29, but he saw Brand employees begin to remove this wood from the U-WPAH as he ended his shift that day.  (*See id.* at 62-63, 66-67.)  Monarch's field superintendent for the DTE project, Richard Castle, explained that this wooden platform had to be removed in order for DTE to inspect the stator, because DTE had to rotate the hood in the upper chamber of the air heater during its inspection and this rotation could not be done with the platform in place.  (*See* DTE's Motion, Ex. D, Castle 3/25/2016 Dep. at 55; *see also* Brand's Motion, Ex. E, Quaine Dep. at 123-24; Plaintiff's Dep. at 219-20.)  Following this September 30 inspection, DTE provided Monarch with a list of repairs to be done to the stator.  (*See* Brand's Motion, Ex. J, Bazzi Dep. at 61-62; Ex. H, Castle 9/23/2015 Dep. at 38-39.)

6

When Plaintiff returned to work for his evening shift on Monday, October 1, 2012, the wooden platform in the U-WPAH had not been replaced and the gaps in the stator's grid work remained uncovered by wood decking. (*See* Plaintiff's Dep. at 66.) He and his co-workers began working in the L-WPAH to install a new alignment bar system when they discovered that some of the stator plates had broken loose and posed a hazard of falling down on the workers, and a Monarch co-worker asked Plaintiff to retrieve a piece of equipment known as a chain fall so that the workers could pull these plates back into place. (*See id.* at 69.)

Plaintiff recalled that there was a chain fall hanging in the U-WPAH, so he went upstairs to retrieve it. (*See id.* at 70-71.)[3] Because the wood decking had been removed from the U-WPAH, yellow caution tape had been strung across the access point for gaining entry to this upper chamber, and there was a tag hanging from this tape warning of a falling hazard beyond that point. (*See* Plaintiff's Dep. at 73-74.)[4] To account for this falling hazard, Plaintiff wore a safety harness and

---

[3]Plaintiff testified that to his knowledge, this was the only chain fall available to him at the time. (*See id.* at 70, 213.) Richard Castle testified, in contrast, that a number of chain falls were kept in gang boxes located on both the east and west sides of the air heater deck. (*See* Castle 3/25/2016 Dep. at 81.)

[4]Mr. Castle testified that this tag also would have listed the names and phone numbers of individuals, including himself, who should be contacted before a worker entered the confined space beyond the yellow tape. (*See* Castle 3/25/2016 Dep. at 77, 80.) Plaintiff, in contrast, stated that he could not recall seeing any such contact information on the tag. (*See* Plaintiff's Dep. at 73-74.) Plaintiff further testified that

attached a retractable lanyard — also referred to as a yo-yo — between the harness and an anchor point on the wall just inside the access point that would catch him in the event of a fall.  (*See id.* at 74-76.)[5]

Because there was no wood decking in the U-WPAH, Plaintiff had to walk along the top edges of the stator's metal grid work in order to reach the chain fall, and he estimated that these metal edges were approximately a half inch thick.  (*See id.* at 79-80, 234-35.)  As Plaintiff traversed this path of narrow metal edges, he lost his balance and fell down into one of the gaps in the grid work.  (*See id.* at 81.)[6]  As he fell into this gap, his armpit caught the top edge of one of the plates that formed the walls of the gap, causing his arm to jerk above his head and injuring his shoulder in the process.  (*See id.* at 81-82.)  Plaintiff managed to pull

---

because he and his Monarch co-workers had strung the caution tape across the access point to the U-WPAH and placed a tag on this tape, there was no need for him or any other member of the Monarch work crew to obtain permission before proceeding through the access point and into the U-WPAH.  (*See id.* at 112, 114, 116.)

[5]Plaintiff testified that he used this same fall protection gear while working in the L-WPAH.  (*See id.* at 199.)  Although there was a wooden work platform in this lower chamber, Plaintiff explained that there were "open holes all around it," and thus a "big fall potential" in this area as well.  (*Id.* at 199-200.)

[6]One investigative report of this incident states that Plaintiff lost his balance when the self-retracting lanyard he was wearing "locked up."  (*See* Plaintiff's Motion, Ex. 7, DTE Lost Time Accident Report.)  Plaintiff disputed this conclusion, however, opining that the lanyard operated properly and that he "just lost [his] balance."  (Plaintiff's Dep. at 82, 255, 259.)

8

himself up out of the gap, and a co-worker eventually drove him to a nearby hospital for treatment.

In Plaintiff's view, his fall and injury were directly attributable to (i) the decision to remove the wood decking from the U-WPAH, and (ii) more importantly, the failure to replace this decking after DTE conducted its September 30, 2012 inspection and before Plaintiff and his Monarch co-workers returned to the work site the next day. (*See id.* at 255-56.) Monarch's field superintendent, Mr. Castle, apportioned the blame differently, opining that Plaintiff was "not permitted" to cross the yellow-tape barrier and enter the U-WPAH on October 1, 2012 because this area "wasn't in the proper condition" for entry and "the proper safety mechanisms weren't in place" to authorize entry. (Castle 3/25/2016 Dep. at 62.)[7] Mr. Castle also did not share Plaintiff's view that wood decking should have been installed in the U-WPAH promptly after DTE's inspection, testifying (i) that

---

[7]As noted earlier, Mr. Castle testified that a tag on the yellow tape blocking entry into the U-WPAH listed names and phone numbers of supervisors, including himself, who should be contacted before a worker entered the area beyond the tape. (*See id.* at 62-63, 80.) He further testified that if Plaintiff wished to enter this area, proper procedure dictated that he contact one of the supervisors identified on this list, so that this supervisor could "go through the normal operating procedures" for allowing entry to this confined space, including air monitoring and identifying and eliminating hazards to entry. (*Id.* at 80, 82.) More specifically, if Plaintiff had asked him for permission to enter the U-WPAH to retrieve a chain fall, Mr. Castle stated that he would have advised Plaintiff to "check the gang boxes" for a chain fall, rather than attempting to retrieve one from the U-WPAH. (*Id.* at 81.)

there was no need for this decking because Monarch's scheduled repair work immediately following DTE's inspection could all be performed from the L-WPAH, (ii) that it would be unsafe for work to be done simultaneously in the U-WPAH and L-WPAH, since the workers in the lower chamber would have "no overhead protection" from falling objects, and (iii) that if welding was being done in the L-WPAH, wood decking in the U-WPAH would prevent proper air flow and pose a danger of smoke build-up in the work area. (*Id.* at 83-84, 89-91.)

### III. <u>ANALYSIS</u>

**A.    The Standards Governing the Parties' Motions**

Through the present motions, Plaintiff and Defendants DTE and Brand each seek an award of summary judgment in their favor on one or more of the claims asserted by Plaintiff against Defendants.  Under the pertinent Federal Rule governing these motions, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

To the extent that a party — here, Plaintiff — seeks an award of summary judgment in its favor on an issue as to which that party bears the burden of proof, the moving party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).  Regardless of the allocation of the burden of proof, the central issue under Rule 56 is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007).  Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other

11

materials." Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party."  *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.    Plaintiff's Claims Are Governed by the Michigan Law of Premises Liability, and Are Barred by the Open and Obvious Nature of the Dangerous Condition That Led to His Injury.**

In his first amended complaint, Plaintiff has advanced two theories of recovery against Defendant DTE:  (i) that his injury is attributable to DTE's active negligence, and (ii) that DTE is liable for the acts of independent contractors working at its power plant due to its retention of control over the work of these contractors and its negligent failure to take reasonable steps to guard against the dangers faced by these contractors in common work areas.  In addition to these claims against DTE, Plaintiff alleges that Defendant Brand's active negligence was a proximate cause of his injury.  As one of the principal grounds for seeking an award of summary judgment in its favor, Defendant Brand argues that

12

Plaintiff's claims of negligence should be viewed as governed by the Michigan law of premises liability. If so, Brand suggests that it cannot be held liable because it did not have possession or control of the premises where Plaintiff sustained his injury, and because the falling hazard that led to Plaintiff's injury was open and obvious. Defendant DTE makes a similar appeal to premises liability law in its motion, albeit only as a fallback to other arguments, contending that Plaintiff became a mere trespasser to whom no duty was owed when he entered the U-WPAH without authorization, and that the danger he faced upon entering this area was open and obvious. As discussed below, the Court agrees that Plaintiff's claims are defeated on these grounds.

As an employee of a contractor (Monarch) retained by the owner of the premises (DTE) to perform scheduled maintenance on an air heater, Plaintiff is properly characterized as an "invitee" under Michigan's premises liability law. *See Perkoviq v. Delcor Homes — Lake Shore Pointe, Ltd.,* 466 Mich. 11, 643 N.W.2d 212, 214 (2002); *see generally Stitt v. Holland Abundant Life Fellowship,* 462 Mich. 591, 614 N.W.2d 88, 91-92 (2000) (describing the "three common-law categories for persons who enter upon the land or premises of another: (1) trespasser, (2) licensee, [and] (3) invitee"). Accordingly, as the premises owner, DTE owed Plaintiff a duty "to exercise reasonable care to protect invitees from an

13

unreasonable risk of harm caused by a dangerous condition of the land that the landowner knows or should know the invitees will not discover, realize, or protect themselves against." *Bertrand v. Alan Ford, Inc.,* 449 Mich. 606, 537 N.W.2d 185, 186 (1995) (internal quotation marks and citations omitted).

To be sure, the claims asserted by Plaintiff against Defendants DTE and Brand do not purport to rest upon these standards of premises liability or the duty owed to Plaintiff as an invitee. Rather, Plaintiff insists that his claims should be analyzed under ordinary negligence principles. As the Michigan Court of Appeals recently emphasized, "Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land." *Buhalis v. Trinity Continuing Care Services,* 296 Mich. App. 685, 822 N.W.2d 254, 258 (2012). It follows, in Plaintiff's view, that the Court need not entertain Defendants' bid to defeat a theory of liability that he has never pled.

Yet, while Plaintiff correctly notes the absence of claims or allegations in his complaint indicating that he is pursuing a theory of premises liability, the Court is "not bound by the labels that parties attach to their claims," but instead must determine "the gravamen of [this] action" by "reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of [Plaintiff's] claim[s]." *Buhalis,* 822 N.W.2d at 258 (internal quotation

14

marks and citations omitted).  In particular, "[i]f the plaintiff's injury arose from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence," and this remains "true even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury."  *Buhalis,* 822 N.W.2d at 258; *see also Kachudas v. Invaders Self Auto Wash, Inc.,* 486 Mich. 913, 781 N.W.2d 806 (2010) (holding that because "the plaintiff in this case is alleging injury by a condition of the land, . . . his claim sounds exclusively in premises liability"); *James v. Alberts,* 464 Mich. 12, 626 N.W.2d 158, 162 (2001) (explaining that "the present case is a premises liability action" in light of the plaintiff's claim "that he was injured by a condition of the land").

Although Plaintiff seeks to attribute his workplace accident to the negligent acts or omissions of one or both Defendants,[8] it nonetheless is clear that his injury was caused by an allegedly dangerous condition in DTE's power plant — namely, the gaps in the grid work of the stator that he was attempting to traverse when he lost his balance and fell.  To be sure, Plaintiff maintains that this dangerous

---

[8]Notably, in his own deposition testimony, Plaintiff was unable to identify any negligent act or omission by Defendant Brand.  To the contrary, he expressly testified that he did not believe "Brand did anything wrong at all," and that the fault should lie with "[w]hoever ordered the decking to be removed" from the U-WPAH, which he believed to be DTE.  (Plaintiff's Dep. at 222, 286-88.)

15

condition was created as a result of Defendants' negligent decision not to reinstall wood decking on the surface of the stator following DTE's inspection of the air heater. The Michigan courts have repeatedly emphasized, however, that an allegation that the defendant caused or created the dangerous condition at issue does not "transform [a premises liability] claim into one for ordinary negligence." *Buhalis,* 822 N.W.2d at 258; *see also Compau v. Pioneer Resource Co., LLC,* 498 Mich. 928, 871 N.W.2d 210 (2015) ("When a plaintiff's injury arises from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence, even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff[']s injury."); *Jahnke v. Allen,* 308 Mich. App. 472, 865 N.W.2d 49, 51-52 (2014). Consequently, even accepting that Defendants could have mitigated the falling hazard posed by the openings in the surface of the stator and the narrowness of the grid work that Plaintiff attempted to traverse in the absence of wood decking, it nonetheless is true that Plaintiff fell as a result of this hazardous condition, and not due to any activity in which either Defendant was engaged at the time of his fall. *See James,* 626 N.W.2d at 162 (finding that the plaintiff's claim was governed by premises liability law because, although the plaintiff's injury occurred while he and the defendant were digging a trench, the plaintiff "contend[ed] that [this injury] arose

16

out of a condition of the land, not out of the activity itself").

The pertinent case law confirms this conclusion that Plaintiff's claims in this case sound in premises liability rather than ordinary negligence.  In *Jahnke*, 865 N.W.2d at 50, for instance, the plaintiff resided in a mobile home adjacent to the defendant's home, and the defendant was the plaintiff's landlord.  The defendant had begun a landscaping project at his home with the help of the plaintiff and others, and the plaintiff was injured when she accompanied the defendant in returning home from a social visit to her residence and slipped on concrete pavers that had been dislodged and relocated in the landscaping project. The plaintiff asserted a claim of negligence against the defendant, but the trial court held that this claim was governed by premises liability law and was barred by the open and obvious doctrine.

The plaintiff argued on appeal that her claim of negligence was properly grounded in the defendant's negligent act — *i.e.,* the allegedly negligent manner in which he "escorted [the] plaintiff across [his] property" — but the Michigan Court of Appeals affirmed the trial court's decision that the "plaintiff's injury occurred because of a condition on the land, the removed concrete pavers, rather than [the] defendant's conduct." *Jahnke,* 865 N.W.2d at 52.  Although the court recognized that the "defendant may have created the condition on the land" through his

17

allegedly negligent actions, it found that this "d[id] not transform the premises liability action into one alleging ordinary negligence."  865 N.W.2d at 52.

Similarly, in *Hall v. IKEA Property  Inc.,* 171 F. Supp.3d 634, 637-38 (E.D. Mich. 2016), the plaintiff was injured as he was carrying a mirror from the defendant retailer's loading dock onto a delivery truck and slipped on a metal plate used to bridge the gap between the loading dock and the back of the truck.  The plaintiff alleged that this accident "never would have occurred" if defendant IKEA had provided a metal loading plate that was sufficient in size to cover the entire gap between the loading dock and the truck, and he asserted a claim of ordinary negligence against IKEA based on the retailer's decision to "provide[] [him] with an undersized docking plate" despite its knowledge "of the potentially dangerous outcomes that might result."  *Hall,* 171 F. Supp.3d at 638-39.

While the court recognized that "a claim under a premises liability theory does not preclude a separate claim grounded on an independent theory of liability based on the defendant's conduct," it nonetheless concluded that the plaintiff could pursue only the former theory of recovery.  171 F. Supp. 3d at 640 (internal quotation marks and citation omitted).  In so holding, the court reasoned that the plaintiff's injury "arose from [an] allegedly dangerous condition on the land" — namely, a "purportedly undersized loading dock plate" — and that IKEA's

18

creation of this condition did not "change the fact that the claim sounds solely in premises liability." 171 F. Supp.3d at 640. The court further explained that the plaintiff had not identified "overt and affirmative conduct" by IKEA, beyond its creation of an allegedly hazardous condition on its property, that might "support a claim for ordinary negligence separate from a premises liability claim." 171 F. Supp.3d at 640; *see also England v. Meijer, Inc.,* No. 322065, 2015 WL 6161735, at *4 (Mich. Ct. App. Oct. 20, 2015) (distinguishing an earlier case in which a defendant's "overt conduct" in "operating and controlling [a] tractor" on his premises gave rise to a "separate duty to use ordinary care," and thus "support[ed] a claim for ordinary negligence in addition to a premises liability claim"); *Ealey v. Rockford Construction Co.,* No. 13-cv-802, 2015 WL 1459228, at *3 (W.D. Mich. March 30, 2015) (collecting cases under Michigan law "in which the courts have found the claims to sound in premises liability rather than ordinary negligence").

As in these other cases, Plaintiff's injury here is attributable to a dangerous condition at DTE's power plant — namely, the stator's grid work that posed a falling hazard due to gaps in the grid and the narrow metal surfaces that, in the absence of wood decking, were the only means of traversing this grid. Although Plaintiff contends that DTE created this hazard through the breach of a duty to "provide[] safe ingress/egress into the air heater's confined space" so that Plaintiff

19

and his Monarch co-workers could safely perform maintenance work on the air heater, (*see* Plaintiffs' Response to DTE's Motion at 3), the law is clear that a defendant property owner's creation of a dangerous condition on its premises does not transform a premises liability claim "into one for ordinary negligence." *Buhalis,* 822 N.W.2d at 258; *see also Compau,* 871 N.W.2d at 210.

Moreover, while Plaintiff alleges in his complaint that DTE violated a host of workplace rules and regulations as it allowed outside workers onto its premises to perform maintenance work, he has not forged any sort of causal link between these alleged violations and his injury. Rather, it is clear, both from Plaintiff's own testimony and the record as a whole, that the specific, allegedly negligent act (or omission) that led to this injury was Defendants' failure to replace the wood decking on the stator's grid work in order to prevent the falling hazard otherwise faced by workers who entered the upper chamber of the air heater. Because this alleged negligence created a dangerous condition in DTE's plant, and did not constitute affirmative, overt conduct giving rise to a separate duty of due care, Plaintiff is limited to a premises liability theory of recovery, and may not pursue a claim of ordinary negligence.

In light of this conclusion, Defendants may appeal to the "open and

obvious" doctrine as defeating any recovery under a theory of premises liability.[9]
As recognized by the Michigan courts, while property owners "have a duty to exercise reasonable care in protecting their invitees, they are not absolute insurers of the safety of their invitees." *Bertrand,* 537 N.W.2d at 188; *see also Hoffner v. Lanctoe,* 492 Mich. 450, 821 N.W.2d 88, 94 (2012).  In particular, a property owner has no duty to protect its invitees from "open and obvious dangers," unless "special aspects of a condition make even an open and obvious risk unreasonably dangerous." *Lugo v. Ameritech Corp.,* 464 Mich. 512, 629 N.W.2d 384, 386 (2001).  Generally speaking, a dangerous condition on land is open and obvious if it is either "known to the invitee" or is "so obvious that the invitee might reasonably be expected to discover" it.  *Lugo,* 629 N.W.2d at 386 (internal quotation marks and citation omitted).

_____

[9]Beyond arguing that the dangerous condition at DTE's power plant that caused Plaintiff's injury was open and obvious, Defendant Brand also appeals to the principle that no duty arises under premises liability law unless the defendant has both possession and control of the premises.  *See Orel v. Uni-Rak Sales Co.,* 454 Mich. 564, 563 N.W.2d 241, 243 (1997).  As Brand states without contradiction, there is no evidence that it had possession and control of DTE's plant, or even the portion of the plant — *i.e.,* the area around the West Primary Air Heater — in which Plaintiff suffered his injury.  (*See* Brand's Motion, Br. in Support at 14-15.)  Plaintiff does not even attempt to contest this point in his response to Brand's summary judgment motion, but instead points only to evidence that Brand participated in the meetings at which it was decided when and whether Brand should install or remove the wooden platforms used by workers to perform maintenance within the upper and lower chambers of the air heater.  Accordingly, this provides a separate basis for awarding summary judgment in Brand's favor on the claims asserted by Plaintiff against this contractor.

In this case, Plaintiff has expressly acknowledged that he was well aware of the falling hazard he faced as he stepped past the yellow caution tape and proceeded into the U-WPAH.  More specifically, Plaintiff has testified (i) that a tag hanging from the caution tape — a tag that he himself might have placed on the tape — warned of a fall hazard in the area beyond the tape, (*see* Plaintiff's Dep. at 73-74, 109-12), (ii) that this tag served as notice to him that the area beyond the tape posed a hazard of falling, (*see id.* at 116-17), (iii) that it was obvious to him that he faced a danger of falling as he entered this area, (*see id.* at 117), and (iv) that this danger was not hidden, as he could "visually see" the gaps in the stator's grid work, (*id* at 117).  Under this record, it is clear beyond dispute that the dangerous condition that led to Plaintiff's injury was "open and obvious" within the meaning of Michigan law.  Indeed, Plaintiff does not even address this subject in his responses to Defendants' motions, much less attempt to identify an issue of fact that might preclude an award of summary judgment in Defendants' favor on this point.

Instead, Plaintiff seeks to avoid this outcome by quoting extensively from the Michigan Supreme Court's decision in *Ghaffari v. Turner Construction Co.,* 473 Mich. 16, 699 N.W.2d 687 (2005).  In that case, the plaintiff employee of an electrical subcontractor was injured when he tripped on pipes at a construction

22

site, and he invoked the "common work area" doctrine as a basis for imposing

liability on the general contractor that served as the construction manager for this

project.  As explained by the court, "[a]t common law, property owners and

general contractors generally could not be held liable for the negligence of

independent subcontractors and their employees," but Michigan law recognized an

"exception to the general rule of nonliability in cases involving construction

projects." *Ghaffari*, 699 N.W.2d at 689-90.  Specifically, under the "common

work area" doctrine, a property owner or general contractor may be deemed liable

for the negligence of an independent subcontractor or its employee if (1) it "failed

to take reasonable steps within its supervisory and coordinating authority (2) to

guard against readily observable and avoidable dangers (3) that created a high

degree of risk to a significant number of workmen (4) in a common area."  699

N.W.2d at 690 (internal quotation marks, emphasis, and citation omitted).[10]

The question before the court in *Ghaffari* was whether a general contractor

that faces liability under the "common work area" doctrine "may avoid [this]

_____

[10]When the defendant is a property owner rather than a general contractor, Michigan law also requires a showing that the owner "act[ed] in a superintending capacity and ha[d] knowledge of high degrees of risk faced by construction workers" on the premises, such that the owner could be said to have "retained control" over the construction project. *Ormsby v. Capital Welding, Inc.,* 471 Mich. 45, 684 N.W.2d 320, 326 (2004) (internal quotation marks and citations omitted).

liability on the basis that the condition giving rise to the injury was open and obvious." *Ghaffari,* 699 N.W.2d at 689. The court held that the "open and obvious" doctrine is not available to a general contractor under these circumstances, reasoning that "the open and obvious doctrine and the common work area doctrine are incompatible," and that the former doctrine should be available only to a property owner defending against a claim of premises liability. 699 N.W.2d at 691.

*Ghaffari* thus is not applicable here, where Plaintiff is limited to a recovery under premises liability law. To be sure, the claims asserted by Plaintiff against Defendant DTE rest in part upon an appeal to the "common work area" doctrine, and such a claim, if viable, would preclude DTE from invoking the "open and obvious" doctrine to avoid liability under this theory of recovery. Yet, as already explained, Plaintiff cannot pursue a claim of ordinary negligence against ***any*** Defendant, whether DTE or Brand, where the record establishes beyond dispute that Plaintiff's injury was caused by a dangerous condition on the land. Because the "common work area" doctrine allows the imposition of liability on a party — *i.e.,* a general contractor or property owner — that otherwise could not be held liable for the negligence of an independent subcontractor or its employees, and because there is no evidence here of a negligent act by a subcontractor or its

24

employee that caused Plaintiff's injury, the "common work area" doctrine does not assist Plaintiff in his effort to hold DTE liable for his injury.  Rather, Plaintiff's sole avenue of recovery against DTE (as well as Brand) is under premises liability law, and any such recovery is precluded by the open and obvious nature of the dangerous condition that caused Plaintiff's injury.[11]

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Brand's May 26, 2016 motion for summary judgment (docket #94) is GRANTED.  IT IS FURTHER ORDERED that Defendant DTE's May 31, 2016 motion for summary judgment (docket #99) also is GRANTED.  IT IS FURTHER ORDERED that Plaintiffs' May 31, 2016 motion for summary judgment (docket #96) is DENIED.

---

[11]In light of this conclusion, the Court need not address DTE's argument in its motion that Plaintiff has failed as a matter of law to establish a basis for imposing liability on DTE under the "common work area" doctrine.

In light of these rulings, IT IS FURTHER ORDERED that Defendant DTE's August 9, 2016 motion to strike the supplemental report of Plaintiff's expert (docket #108) is DENIED AS MOOT, and that Defendant DTE's March 7, 2016 objections to the Magistrate Judge's order granting Plaintiffs' motion to compel (docket #83) likewise are DISMISSED AS MOOT.

s/Gerald E. Rosen<br>United States District Judge

Dated:  January 17, 2017

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 17, 2017, by electronic and/or ordinary mail.

s/Julie Owens<br>Case Manager, (313) 234-5135